UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

JASON H.,                          )
                                   )
            Plaintiff              )
                                   )
v.                                 )   No. 1:17-cv-00344-LEW
                                   )
NANCY A. BERRYHILL,                )
Acting Commissioner of Social Security, )
                                   )
            Defendant              )

**REPORT AND RECOMMENDED DECISION**[1]

This Social Security Disability ("SSD") appeal raises the question of whether the administrative law judge ("ALJ") supportably found the plaintiff capable of performing past relevant work and, in the alternative, performing work existing in significant numbers in the national economy. The plaintiff seeks remand on the bases that the ALJ ignored his learning disability and erred in evaluating both the opinion evidence of record and his own statements concerning his symptoms and limitations. *See* Plaintiff's Itemized Statement of Errors ("Statement of Errors") (ECF No. 15) at 4-18. I conclude that the ALJ's decision was based on substantial evidence and, accordingly, recommend that the court affirm the commissioner's decision.

Pursuant to the commissioner's sequential evaluation process, 20 C.F.R. § 404.1520; *Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6 (1st Cir. 1982), the ALJ found, in relevant part, that the plaintiff met the insured status requirements of the Social Security Act

---

[1] This action is properly brought under 42 U.S.C. § 405(g). The commissioner has admitted that the plaintiff has exhausted his administrative remedies. The case is presented as a request for judicial review by this court pursuant to Local Rule 16.3(a)(2), which requires the plaintiff to file an itemized statement of the specific errors upon which he seeks reversal of the commissioner's decision and to complete and file a fact sheet available at the Clerk's Office, and the commissioner to file a written opposition to the itemized statement. Oral argument was held before me pursuant to Local Rule 16.3(a)(2)(D), requiring the parties to set forth at oral argument their respective positions with citations to relevant statutes, regulations, case authority, and page references to the administrative record.

through December 31, 2018, Finding 1, Record at 13; that he had the severe impairments of affective disorder/depression, anxiety-related disorder/anxiety NOS (Not Otherwise Specified), Finding 3, *id.*; that he had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with the following nonexertional limitations: he was able to understand, remember, and carry out simple, routine tasks, was able to make simple work-related decisions, could work in sight of co-workers but could not perform tandem work, could interact occasionally with supervisors but never with the general public, and could tolerate few changes in the normal work routine, Finding 5, *id.* at 16; that he was capable of performing past relevant work as a cleaner, which did not require the performance of work-related activities precluded by his RFC, Finding 6, *id.* at 18; that, in the alternative, considering his age (37 years old, defined as a younger individual, on his alleged disability onset date, February 23, 2013), education (at least high school), work experience (transferability of skills immaterial), and RFC, there were jobs existing in significant numbers in the national economy that he could perform, *id.* at 19; and that he, therefore, had not been disabled from his alleged onset date of disability, February 23, 2013, through the date of the decision, June 28, 2016, Finding 7, *id.* at 20. The Appeals Council declined to review the decision, *id.* at 1-3, making the decision the final determination of the commissioner, 20 C.F.R. §§ 404.981; *Dupuis v. Sec'y of Health & Human Servs.*, 869 F.2d 622, 623 (1st Cir. 1989).

The standard of review of the commissioner's decision is whether the determination made is supported by substantial evidence. 42 U.S.C. § 405(g); *Manso-Pizarro v. Sec'y of Health & Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). In other words, the determination must be supported by such relevant evidence as a reasonable mind might accept as adequate to support the conclusion drawn. *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).

The ALJ reached Step 4 of the sequential evaluation process, at which stage the claimant bears the burden of proving inability to return to past relevant work. 20 C.F.R. § 404.1520(f); *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). At this step, the commissioner must make findings of the plaintiff's RFC and the physical and mental demands of past work and determine whether the plaintiff's RFC would permit performance of that work. 20 C.F.R. § 404.1520(f); Social Security Ruling 82-62 ("SSR 82-62"), reprinted in *West's Social Security Reporting Service Rulings 1975-1982*, at 813.

In the alternative, the ALJ reached Step 5 of the sequential evaluation process, at which stage the burden of proof shifts to the commissioner to show that a claimant can perform work other than his past relevant work. 20 C.F.R. § 404.1520(g); *Yuckert*, 482 U.S. at 146 n.5; *Goodermote*, 690 F.2d at 7. The record must contain substantial evidence in support of the commissioner's findings regarding the plaintiff's RFC to perform such other work. *Rosado v. Sec'y of Health & Human Servs.*, 807 F.2d 292, 294 (1st Cir. 1986).

The statement of errors also implicates Step 2 of the sequential evaluation process. Although a claimant bears the burden of proof at Step 2, it is a *de minimis* burden, designed to do no more than screen out groundless claims. *McDonald v. Sec'y of Health & Human Servs.*, 795 F.2d 1118, 1124 (1st Cir. 1986). When a claimant produces evidence of an impairment, the commissioner may make a determination of non-disability at Step 2 only when the medical evidence "establishes only a slight abnormality or [a] combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered." *Id.* (quoting Social Security Ruling 85-28).

## I. Discussion

### A. Evidence of Learning Disability

The plaintiff contends that the ALJ improperly ignored special education records evidencing a learning disability. *See* Statement of Errors at 5. Specifically, he argues that the ALJ should have found a severe learning disability at Step 2, *see id.* at 3, which would have undermined her mental RFC determination and, in turn, her reliance on vocational expert testimony predicated on the flawed mental RFC. *See id.* at 16-18. The plaintiff points out that the agency nonexamining consultants on whose opinions the ALJ relied, Brian Stahl, Ph.D., and David R. Houston, Ph.D., did not see his special education records, which were submitted after they completed their assessments. *See id.* at 3 n.1.

The commissioner argues that the plaintiff's special education records are cumulative of records from his treating providers that Drs. Stahl and Houston did review addressing the effects of his learning disability. *See* Defendant's Opposition to Plaintiff's Itemized Statement of Errors ("Opposition") (ECF No. 19) at 5-6 (citing *Strout v. Astrue*, Civil No. 08-181-B-W, 2009 WL 214576, at *8-9 (D. Me. Jan. 28, 2009) (rec. dec., *aff'd* Mar. 5, 2009) (ALJ did not err in relying on opinions of agency nonexamining consultants who had not had benefit of review of full record when unseen records were cumulative of those they did see)). As a result, the commissioner asserts, Drs. Stahl and Houston factored those effects into their evaluations. *See id.* at 6. I agree.

An ALJ may rely on the opinions of agency nonexamining consultants who have not seen later-submitted evidence when that evidence does not "call into question their conclusions[.]" *Anderson v. Astrue*, No. 1:11-cv-476-DBH, 2012 WL 5256294, at *4 (D. Me. Sept. 27, 2012) (rec. dec., *aff'd* Oct. 23, 2012), *aff'd*, No. 13-1001 (1st Cir. June 7, 2013). Here, the later-submitted evidence (the plaintiff's special education records) was created during his grade school

and high school years, predating his alleged onset date of disability by nearly 20 years or more. *See e.g.* Record at 213-14 (May 1987), 247-48 (March 1985), 374-77 (1991-92). Moreover, his treating providers, at least some of whose records Drs. Stahl and Houston reviewed, noted his history of having a learning disability. *See, e.g., id.* at 59, 61, 71, 522, 530.[2]

And, although the ALJ did not explicitly mention the plaintiff's special education records, she acknowledged that he reported "being easily confused because of a learning disability with a loss of focus from fatigue and racing thoughts[,]" *id*. at 14, and she included the special education records in the List of Exhibits appended to her decision, *see id*. at 23, creating a presumption that she considered them, *see, e.g., Chapman v. Colvin*, No. 1:16-cv-00231-JDL, 2016 WL 7441609, at *3 (D. Me. Dec. 26, 2016) (rec. dec., *aff'd* Feb. 10, 2017) (inclusion of evidence in a List of Exhibits creates a presumption that ALJ considered that evidence).[3]

On this record, the plaintiff's later-submitted evidence (his special education records) has not called into question the conclusions of the agency nonexamining consultants.

Finally, even assuming *arguendo* that the plaintiff had shown error in the ALJ's reliance on the opinions of agency nonexamining consultants who did not have the benefit of review of his special education records and/or her own failure to consider those records adequately, he fails to demonstrate harmful error.

---

[2] The plaintiff's mother, Linda Pomeroy, also provided information about his learning disability in her third-party function report, *see* Record at 153-55, which the ALJ cited, albeit not for that point, *see id.* at 15.

[3] This presumption is rebuttable. *See, e.g., Ferguson v. Berryhill*, No. 1:16-cv-00489-DBH, 2017 WL 2417849, at *4 (D. Me. June 4, 2017) (rec. dec., *aff'd* June 20, 2017). The plaintiff argues that in this case, as in *Ferguson*, the court should deem the presumption rebutted because the agency nonexamining consultants on whose opinions the ALJ relied did not have the benefit of review of that evidence and because the court cannot otherwise determine from the ALJ's discussion that she considered it. *See* Statement of Errors at 17. However, as the commissioner rejoins, *see* Opposition at 4, in this case, unlike in *Ferguson*, the plaintiff has not identified evidence in the records at issue that specifically contradicts the ALJ's findings, *compare Ferguson*, 2017 WL 2417849, at *4 (claimant rebutted presumption that ALJ had reviewed evidence when ALJ "made a finding that she could not have made if she had carefully reviewed the earlier materials: that the [claimant]'s testimony that he had a job coach when he was working was not reflected in the record").

5

The plaintiff observes that his special education records show that his "verbal I.Q. was tested at 78, which falls in the 7th percentile." Statement of Errors at 4 (citations omitted). He contends that ignoring this evidence was not harmless error because, according to the *Dictionary of Occupational Titles* (U.S. Dep't of Labor 4th ed., rev. 1991) ("DOT"), the jobs identified by the vocational expert at the hearing all "require a verbal aptitude above the lowest ten percent[.]" *Id.* at 16.

Even assuming that the plaintiff's characterization of his childhood special education testing as it relates to the DOT's terms is correct, the plaintiff's subsequent work history is fatal to his argument. While, as the plaintiff's counsel observed at oral argument, "an IQ is presumed to remain stable over time[,]" that presumption is rebuttable. *Harthorne v. Astrue*, Civil No. 08-120-B-W, 2008 WL 4937806, at *8 (D. Me. Nov. 16, 2008) (rec. dec., *aff'd* Dec. 8, 2008).

In this case, the plaintiff's work history rebuts his restrictive IQ score. The ALJ found that the plaintiff was capable of returning to past relevant work as a cleaner, DOT § 381.687-014, both as he actually performed it and as it is generally performed, and, in the alternative, that he was capable of performing other work existing in significant numbers in the national economy, including the representative jobs of laundry worker, *id*. § 361.685-018, conveyor feeder, *id*. § 921.686-014, and garbage collector, *id*. § 955.687-022. *See* Record at 18-20.

Despite his learning disability, the plaintiff worked for the years leading up to his alleged onset date of disability as a cleaner, *see id.* at 134-35, a job that requires a verbal aptitude above the bottom 10th percentile, *see* DOT § 381.687-014, as do all three of the jobs on which the ALJ relied in the alternative at Step 5, *see id*. §§ 361.685-018, 921.686-014, 955.687-022.[4]

---

[4] The plaintiff adds that, although Drs. Stahl and Houston relied in part on the fact that he ran a seafood business, they were unaware that, as he later testified at hearing, he took over the business from his parents, ran it with his mother, and did not deal with customers, and that the venture ultimately went out of business after it was repeatedly shut down

6

The plaintiff, accordingly, fails to demonstrate his entitlement to remand on the basis of this point of error.

## B. Treating Providers' Opinion Evidence

The plaintiff next complains that the ALJ erred in ignoring Global Assessment of Functioning ("GAF") scores of 47 assessed by treating nurse practitioners Donna R. Huff, PMH-NP, and Heather Bowker, PMH-NP, and refusing, "without an adequate reason[,]" to give the mental RFC opinion of treating nurse practitioner Marilynn Petit, PMH-NP, any significant weight. Statement of Errors at 7-9, 17-18.[5] He adds that the ALJ transgressed Social Security Ruling 16-3p ("SSR 16-3p") in failing to "focus on the consistent symptoms of learning disability, leading to severe anxiety and depression," that he described to his treating providers, which were reflected in their own opinions regarding his symptoms and limitations. *Id*. at 9-10.

---

by the Marine Resources Division. *See* Statement of Errors at 3 n.1; Record at 34-36, 46-47, 63, 74. At oral argument, the plaintiff's counsel contended that his client's mother functioned essentially as a job coach for her son. He posited that, had Drs. Stahl and Houston reviewed the plaintiff's testimony regarding the manner in which he ran the seafood business, as well as portions of the special education records underscoring his lifelong difficulties in word retrieval, listening comprehension, and auditory processing, they likely would have assessed greater limitations, particularly in pace and ability to deal with supervisors. The force of these points, however, is undercut by the plaintiff's performance of the cleaner job in the years prior to his alleged onset date of disability, during which, as his counsel acknowledged at oral argument, he had no equivalent of a job coach. *Compare, e.g.*, *Ferguson*, 2017 WL 2417849, at *7 (ALJ's error in ignoring evidence that claimant required a job coach was not harmless given vocational expert's testimony that a job coach who comes to an individual's place of work is an accommodation).

[5] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed., text rev. 2000) ("DSM-IV-TR"). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id*. The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id*. at 34. A GAF score of 41 to 50 represents "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id*. (boldface omitted). In 2013, the DSM-IV-TR was superseded by the American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM-V"), which jettisoned the use of GAF scores. *See* DSM-V at 16 ("It was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice."). Nonetheless, I assess the supportability of the ALJ's decision based on the evidence available to her at that time.

The ALJ considered mental RFC opinions provided by both NP Bowker and NP Petit, explaining:

> I give little weight to an assessment provided by Ms. Bowker in November 2013, since her suggestion of the [plaintiff] as fundamentally unable to meet competitive employment standards does not comport with his demonstrated level of function, or with her essentially unremarkable mental status examinations. Similarly, Ms. Petit's evaluation, while not as restrictive as Ms. Bowker's, nonetheless remains at odds with the evidence of record, and I accord it minimal weight.

Record at 18 (citations omitted). I discern no error in her handling of the opinion of NP Petit.

First, as the commissioner rejoins, *see* Opposition at 14 n.4, neither NP Petit nor the plaintiff's other treating providers qualifies as a "treating source" pursuant to the regulations in place at the time of the ALJ's decision. *See* 20 C.F.R. §§ 404.1502(a)(7), 404.1513(a)(2), 404.1527(a)(2). Thus, the ALJ was not required to supply "good reasons" for rejecting their opinions. *See, e.g., King v. Astrue*, Civil No. 09-337-P-H, 2010 WL 4457447, at *4 (D. Me. Oct. 31, 2010) (rec. dec., *aff'd* Nov. 22, 2010) (ALJ not expressly required to supply "good reasons" for discounting the opinion of a source who is not an acceptable medical source).[6]

Instead, the ALJ was obliged only to "explain the weight given to" their opinions "or otherwise ensure that the discussion of the evidence . . . allows a claimant or subsequent reviewer to follow [her] reasoning[.]" Social Security Ruling 06-03p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2018) ("SSR 06-03p"), at 331. The ALJ's discussion satisfied that obligation here.

Second, and in any event, inconsistency with other evidence of record constitutes a good reason to afford even the opinion of a treating source little weight. *See, e.g., Campagna v. Berryhill*, No. 2:16-cv-00521-JDL, 2017 WL 5037463, at *4 (D. Me. Nov. 3, 2017) (rec.

---

[6] With respect to claims filed on or after March 27, 2017, the commissioner has recognized several additional categories of practitioners, including nurse practitioners, as "acceptable medical sources." 20 C.F.R. § 404.1502(a)(7).

8

dec., *aff'd* Jan. 2, 2018). Earlier in her decision, the ALJ had explained why, in her view, this was so:

> [A]lthough the [plaintiff] subjectively reported on-going issues with apprehension, sadness and anger, Ms. Petit most often reported objectively mental status examinations as within normal limits. I do not find such discrepancies consistent, nor is the [plaintiff]'s dire level of impediment substantiated by the fact that he stopped taking all of his medications without benefit of medical advice in May 2015.

Record at 17 (citation omitted). As the commissioner observes, *see* Opposition at 7, "[n]ormal mental status examinations reasonably may be viewed as inconsistent with marked limitations[,]" *Guest v. Berryhill*, No. 2:16-cv-00228-JHR, 2017 WL 2414468, at *4 (D. Me. June 2, 2017) (citations and internal quotation marks omitted).

The plaintiff's related point, that the ALJ erred in failing to assess opinion evidence in the form of GAF scores assessed by NP Huff and NP Bowker, is also unavailing. In this context, as well, the ALJ was obliged only to "explain the weight given to" those opinions "or otherwise ensure that the discussion of the evidence . . . allows a claimant or subsequent reviewer to follow [her] reasoning[.]" SSR 06-03p at 331. While the ALJ did not expressly discuss the GAF scores, the reasons she supplied for discounting the Bowker and Petit opinions apply to the GAF scores to the extent construed to reflect serious occupational impairment.[7] A subsequent reviewer, thus, can follow her reasoning, as required by SSR 06-03p.

The plaintiff finally argues that the ALJ transgressed SSR 16-3p in failing to focus on "the consistent symptoms of learning disability, leading to severe anxiety and depression," that he

---

[7] GAF scores do not necessarily reflect impairments in occupational functioning. *See, e.g.*, *Campagna*, 2017 WL 5037463, at *6 ("because GAF scores can be based on behaviors that have little or no relationship to occupational functioning, ALJ properly discounted importance of such scores when, in her view, claimant's relatively normal activities of daily living and other evidence revealed an ability to do what he chose to do") (citation and internal quotation marks omitted).

described to his providers, which were reflected in their opinions. Statement of Errors at 9-10. Yet, SSR 16-3p does not require that an ALJ catalogue every symptom described to a provider or reach any particular conclusion regarding those reported symptoms; rather, it requires that an ALJ consider a claimant's reported symptoms. *See* SSR 16-3p, reprinted in *West's Social Security Reporting Service* Rulings 1983-1991 (Supp. 2018), at 670. The ALJ did so here, summarizing symptoms that the plaintiff had reported to his treating providers. *See, e.g.*, Record at 14.[8]

The plaintiff, accordingly, fails to demonstrate his entitlement to remand on the basis of this point of error.

### C. Evaluation of Subjective Symptoms

The plaintiff, finally, challenges the ALJ's assessment of both his subjective statements and the third-party function report of his mother, Linda Pomeroy. *See* Statement of Errors at 6-7, 10-16. I find no error.

#### 1. Plaintiff's Statements

Pursuant to SSR 16-3p, the factors that an ALJ is to consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms include (i) daily activities, (ii) "[t]he type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms[,]" and (iii) "[t]reatment, other than medication, an individual receives or has received for relief of pain or other symptoms[.]" SSR 16-3p at 671.

The commissioner adopted SSR 16-3p to "eliminate[e] the use of the term 'credibility'" and "clarify that subjective symptom evaluation is not an examination of an individual's

---

[8] The commissioner persuasively argues that, although the plaintiff asserts in passing that the ALJ failed to offer good reasons for her handling of other treating provider opinions, the point is sufficiently undeveloped as to be waived. *See* Opposition at 14 n.4; Statement of Errors at 14-15, 17-18; *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). To the extent that the plaintiff means to incorporate by reference his arguments concerning NP Petit, they fail for the reasons discussed above.

character." *Id*. at 665. However, but for the use of the term "credibility," the deferential standard of review of an ALJ's evaluation of a claimant's statements continues to apply. *See Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987) ("The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings.").

The plaintiff contends that the ALJ failed to make specific findings supported by substantial evidence, as required "in determining to disbelieve the [claimant]." Statement of Errors at 15 (quoting *Da Rosa v. Sec'y of Health & Human Servs*., 803 F.2d 24, 26 (1st Cir. 1986)). I conclude that this standard was met, entitling the ALJ's evaluation of the plaintiff's statements to deference.

As the commissioner observes, the ALJ articulated several reasons for discounting the plaintiff's statements regarding his symptoms and limitations: that (i) his "alleged mental dysfunction was inconsistent with the objective medical evidence;" (ii) he "pursued largely conservative treatment, including medication management;" (iii) he "continuously failed to pursue his treatment provider's recommendation that he seek counseling or therapy;" and (iv) he "did not seek emergency psychiatric care or care with an acceptable medical source, such as a psychologist or psychiatrist." Opposition at 8 (citing Record at 16-18).

The plaintiff, first, generally argues that, "[contrary] to the ALJ's superficial analysis, [he] has had severe problems consistently over time[,]" a proposition for which he recites details of his testimony at hearing. Statement of Errors at 6-7. However, the ALJ was not obliged to accept that testimony at face value; indeed, it was her job to resolve evidentiary conflicts. *See, e.g., Rodriguez*, 647 F.2d at 222 ("The Secretary may (and, under his regulations, must) take medical evidence.

11

But the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [her], not for the doctors or for the courts."). That the ALJ declined to accept the plaintiff's testimony wholesale was not, in itself, error.

The plaintiff, next, takes issue with the ALJ's rejection of his subjective statements on the basis of his asserted failure to seek treatment (stopping medication use, declining to obtain recommended counseling). *See* Statement of Errors at 12-16.

The ALJ noted, in relevant part, that the plaintiff had begun medication management in June 2013 with NP Bowker, who "persisted in advising [him] that he should seek counseling as a necessary counterpart to medication, but where he continuously demurred, offering various, but less than persuasive[,] excuses[,]" such as "I don't like talking to people" or "my car is broken." Record at 17 (citations and internal quotation marks omitted). She noted that, although NP Bowker "repeated this advice at every office visit for nearly a year and a half, . . . the [plaintiff] did not seek therapeutic counseling until the beginning of 2015, after Ms. Bowker left . . . in October 2014 and [the plaintiff] had to obtain a new provider." *Id*. (citation omitted).

The ALJ observed that the plaintiff established care with NP Petit for medication management in December 2014, two months after his final appointment with NP Bowker, but that his alleged "dire level of impediment" was unsubstantiated by both NP Petit's largely normal findings on mental status examination and "the fact that [the plaintiff] stopped taking all of his medications without benefit of medical advice in May 2015." *Id*. (citation omitted).

She noted that, while the plaintiff sought counseling therapy with Ann Barclay, L.C.P.C., off and on for seven months in 2015, as of the date of the decision, he had not seen her for nearly a year, since August 8, 2015. *See id*. She observed:

> I find such actions of stopping medications and reluctance to attend counseling reflective of a general pattern; i.e. the [plaintiff] reports life-long problems for

12

which he acknowledges a need for assistance, but he then does not maintain
stability in adhering to treatment. I cannot appropriately find an individual disabled
if he fails to follow prescribed treatment without sufficient explanation, nor can I
resolve the patent discrepancy in the [plaintiff]'s apparent unwillingness to help
himself by engaging in consistent treatment that could ameliorate his symptoms.
Also of significance, Ms. Petit's records show that the [plaintiff] has since resumed
a regimen of Seroquel, Prozac and Xanax, which he testified as helpful.

*Id*. (citations omitted). She added:

[I]f [the plaintiff] were experiencing the incapacitating level of mental dysfunction
he purports, I cannot reconcile the absence of a greater level of psychiatric care as
mandated by treating providers. [He] has never sought emergency mental health
care or crisis services, nor have any of his providers seen the need to refer him to
said services or directed him to a psychologist or psychiatrist. From a
nonprofessional's perspective, I recognize anhedonia may manifest as avoidance,
but the [plaintiff] has nonetheless demonstrated the ability to persist, as evinced by
his acknowledgement to providers of his problems and his consistent treatment for
more than a year with Ms. Bowker.

*Id*. at 18 (citations omitted).

The plaintiff complains that, in so finding, the ALJ (i) engaged in unsupported speculation regarding his failure to engage in counseling sooner, (ii) wrongly held against him a failure to seek emergency mental health services and the lack of a referral by his providers to a psychiatrist or psychologist, (iii) improperly substituted her lay judgment for that of experts in determining that his failure to seek treatment could not be due to his psychiatric symptoms, and (iv) failed to make any inquiry into his reasons for declining treatment. *See* Statement of Errors at 12-16.[9]

He cites Social Security Ruling 82-59 ("SSR 82-59") for the proposition that, "if the ALJ intends to deny benefits on the basis that the claimant has not engaged in appropriate treatment, she must first warn the claimant and allow an opportunity to correct the deficiency," *id*. at 13 n.9, and *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008), for the proposition that an ALJ "'must not

---

[9] The plaintiff also takes issue with the ALJ's use of the word "mandated," noting that, in Maine, treating providers cannot mandate care unless an individual is a danger to self or others. Statement of Errors at 13. Nonetheless, as the commissioner rejoins, *see* Opposition at 12, the ALJ's point was simply that the plaintiff did not avail himself of treatment repeatedly recommended by his treating providers, *see* Record at 18.

13

draw any inferences about a claimant's condition from this failure [to obtain treatment] unless the ALJ has explored the claimant's explanations as to the lack of medical care[,]'" *id.* at 15 n.10 (quoting *Craft*, 539 F.3d at 679).

As the commissioner rejoins, this is not a "failure to follow treatment" case where the ALJ denied the plaintiff's claim on the basis of his failure to follow treatment recommendations. *See* Opposition at 11-12; *MacNeil v. Soc. Sec. Admin. Comm'r*, No. 1:10-cv-00393-JAW, 2011 WL 4436975, at *5 (D. Me. Sept. 21, 2011) (rec. dec., *aff'd* Oct. 13, 2011) ("When the 'failure to follow' issue presents the tipping point between a finding of disabled versus a finding of not disabled, the Commissioner must conduct an analysis of whether the claimant's failure to follow prescribed treatment is justifiable.") (citation omitted). Instead, the ALJ declined to credit the plaintiff's subjective statements in part on the basis of his failure to seek additional treatment, some of which was recommended by his treating providers. In that context, she did consider the plaintiff's explanations to providers as to why he did not seek recommended treatment; she simply found them "less than persuasive[.]" Record at 17. This conclusion, in turn, was both supported by substantial evidence and not the product of an impermissible expert judgment by a layperson.

The record is replete with the plaintiff's explanations for why he did not seek treatment for his mental health, as well as evidence that he repeatedly ignored recommendations to seek mental health treatment. *See, e.g., id.* at 519, 548, 552, 556, 560, 564, 636, 641, 646, 651, 656, 661, 666, 682, 746 (explanations by plaintiff that he did not like to talk to people, was afraid to leave the house, and did not have adequate transportation). However, the ALJ supportably deemed these explanations less than persuasive given NP Bowker's persistence in making the counseling recommendation in the face of those excuses and the plaintiff's ability to talk to providers regarding his problems and persist in treatment with NP Bowker for more than a year. *See id.* at

14

17-18. Indeed, as the commissioner observes, *see* Opposition at 11, NP Bowker went so far as to recommend that the plaintiff use a transportation service to attend therapy treatment, providing him contact information for such a service, *see* Record at 702.

While the ALJ did state that, "[f]rom a nonprofessional's perspective," she recognized that "anhedonia may manifest as avoidance," but found that the plaintiff had "demonstrated the ability to persist," *id.* at 18, this was not an impermissible substitution of her lay judgment for that of an expert. The plaintiff identifies no evidence that any of his providers concluded that his mental impairments impeded his ability to follow prescribed treatment, and NP Bowker's persistence in prescribing therapy treatment suggests otherwise. Further, as the ALJ noted, the plaintiff was able to persist with certain kinds of treatment as evidenced "by his acknowledgement to providers of his problems and his consistent treatment for more than a year with" one of his providers. *Id.*[10]

Finally, the ALJ did not err in relying in part on the observation that the plaintiff had not sought emergency mental health treatment or been referred to a psychiatrist or psychologist. The plaintiff argues that he did not "qualify" for emergency mental health treatment and that there was "no indication anywhere in this record that anyone has suggested that there is a psychologist or psychiatrist available in the area who would be willing to take him on as a patient for these problems or whose services [the plaintiff] could obtain or . . . who could treat [the plaintiff] more effectively than the providers he saw." Statement of Errors at 13-14. While these arguments would be relevant in a case finding a claimant disabled but for "failure to follow treatment," they are not relevant here.

---

[10] The plaintiff argues that this traps him in a paradox in which his anxiety over talking to people, which prevents him from seeking talk-therapy treatment, is used as evidence against the debilitating nature of his anxiety. *See* Statement of Errors at 12. The plaintiff argues that his reluctance to obtain such treatment is, instead, evidence of the impact of his anxiety. *See id.* This would be a frustrating catch-22 but for the fact that, as the commissioner argues, *see* Opposition at 13, the ALJ supportably deemed him able to seek treatment requiring interaction with treating providers.

15

Beyond that, as the commissioner notes, *see* Opposition at 12-13, NP Bowker provided the plaintiff with psychiatric emergency numbers to dial in case of an emergency and advised him to call, instead of waiting for his next appointment, if his condition worsened or he experienced adverse effects, *see, e.g.*, Record at 636, 641. The ALJ properly found that the plaintiff's lack of use of emergency treatment and the absence of referral to a psychiatrist or psychologist weighed against his allegations of debilitating psychological symptoms.

## 2. Mother's Report

In determining that the plaintiff had no mental health impairment(s) that met or equaled the criteria of any impairment listed in Appendix 1 to 20 C.F.R. Part 404, Subpart P (the "Listings"), the ALJ cited, *inter alia*, a third-party function report completed by the plaintiff's mother. *See* Record at 15. The plaintiff contends that, in so doing, the ALJ impermissibly cherry-picked the evidence, leaving out "all of the mother's explanations regarding [his] limitations and include[d] only those things that might suggest he is more capable." Statement of Errors at 11.

In particular, the plaintiff faults the ALJ for not discussing his mother's statements that his learning disability made it difficult for him to understand instructions, follow directions, or hear and concentrate when there were many people around; he had difficulty interacting with people, including working with even the two or three people he worked with, would only shop for five to 10 minutes, and did not get along with most neighbors; and was having difficulty sleeping and could no longer work at his former job. *See* Statement of Errors at 10-11. However, as the commissioner observes, *see* Opposition at 8-9, the ALJ took into account similar allegations made by the plaintiff himself, *see* Record at 14, and the plaintiff does not suggest that the ALJ mischaracterized the evidence from his mother's report on which she did rely, *see* Statement of Errors at 10-12.

16

At bottom, in this instance, as well, the ALJ permissibly resolved conflicts in the evidence. *See, e.g., Rodriguez*, 647 F.2d at 222 ("[T]he resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the ALJ], not for the doctors or for the courts.").

## II. Conclusion

For the foregoing reasons, I recommend that the commissioner's decision be **AFFIRMED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 4th day of November, 2018.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge